Filed 8/15/16  In re Ki. W. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Ki.W., a Person Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ROOSEVELT W.,<br><br>        Defendant and Appellant. | B265472<br>(Los Angeles County<br>Super. Ct. No. CK89770) |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Roosevelt W. (Father) and K.G. (Mother) are the parents of one-year old Ki.W. "Ki" Ki was detained from her parents in May 2014. At the review hearing in June 2015, the court found that the Department of Children and Family Services (DCFS) provided reasonable reunification services for Father, and that although he had completed 37 weeks of his 52-week anger management and domestic violence counseling program, he had achieved insufficient progress to regain custody of Ki or be provided unmonitored visitation. The court extended reunification services for an additional period. Within days of the review hearing, the court issued a one-year restraining order, precluding Father from coming within 100 yards of the caseworker. Father contends that substantial evidence does not support the findings that return of custody would have endangered Ki or that DCFS provided reasonable services. He further contends that the court abused its discretion in ordered monitored visitation. Finally, he contends there was no factual basis for issuance of the restraining order. We affirm the court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Proceedings Involving Older Children, K and Ky*

The family has been the subject of two prior proceedings. In September 2011, Mother, then living with her parents and Ki's older brother, "K," had a mental breakdown. Jurisdiction was asserted under Welfare and Institutions Code section 300, subdivision (b) based on the court's findings that Mother had mental and emotional problems that rendered her incapable of providing regular care for K, that Mother had struck K with a belt, and that Father and Mother had a history of engaging in violent altercations when K was present.[1] The court specifically found that Father had struck Mother with a rope, tied her to a chair, and slapped

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

her, and that Mother had thrown boiling water at Father.[2]  In July 2012, the juvenile court directed Father to participate in individual counseling to address domestic violence and other case issues with a DCFS-approved counselor.  Father, who was a resident of Alabama and had participated in a month-long parenting class and anger management program in that state, refused to participate in additional services.  In November 2013, the court terminated reunification services for K, and scheduled a section 366.26 hearing to consider termination of parental rights over the boy.[3]

In 2012, during the pendency of the proceedings involving K, a second child -- "Ky" -- was born, testing positive for marijuana.  Mother acceded to jurisdiction based on her mental and emotional problems, her use of marijuana, and the physical abuse of K and domestic violence described above.[4]  In July 2014, the grandparents with whom the children were residing applied to adopt K and Ky.

---

[2]   Respondent's brief discusses additional serious allegations of domestic violence raised in the proceedings, including allegations that Father pointed a gun at Mother and dragged her by the hair.  As there is nothing in the record to indicate the court found these additional allegations true, we do not consider them.  The brief also contends that anonymous persons were "unwilling to come forward to provide a statement because of their fear of Father."  The court below did not rely on anonymous allegations, and neither do we.

[3]   Father appealed that order, and this Court affirmed.  Mother's services, which had been terminated in January 2013, were reinstated and terminated a second time at the June 2015 hearing that is the subject of this appeal.  Mother is not a party to this appeal.  K is not a subject of this appeal.

[4]   At the November 2013 hearing at which reunification services for K were terminated, the court provided Father reunification services for Ky.  (Services were not offered earlier because Mother had misled the court and DCFS about Ky's parentage.)  Father filed an appeal of the dispositional order, contending that the court should have transferred custody of Ky to him or at least provided unmonitored visitation.  In support of his appeal, he asserted, as he had with K, that the services he received in Alabama were sufficient to address the concerns that caused the court to assert jurisdiction.  We affirmed the court's orders.  At the June 2015 hearing that is the subject of this appeal,
*(Fn. continued on next page.)*

3

B. *Underlying Proceedings*

1. *Events Preceding Jurisdictional/Dispositional Hearing*

In August 2013, Mother gave birth to the couple's third child, "Ki" She and Ki lived with a maternal aunt and uncle. Because the baby was being well cared for, Mother was complying with her case plan and Father appeared to have returned to Alabama, DCFS did not intervene until April 2014, when it received reports that Father had either moved into the home or was a daily visitor, and that while accompanying Mother to a medical appointment for one of the children, Father had been "combative" and "verbally aggressive" toward Mother and the maternal grandmother. Contacted by a caseworker, Mother denied Father lived with her or was visiting regularly. After several unannounced visits, however, caseworkers found Father at the home. Father refused to answer questions concerning why he was there or where he was living. He behaved in a threatening manner, yelling and screaming for an extended period. Fearful that he would become physically violent, the caseworkers called law enforcement. When police officers arrived, Father continued to yell and refused to answer questions. He claimed to have sent Mother and Ki to Alabama. When Mother and Ki were located (still in the area), DCFS removed Ki and placed her with her older siblings in her grandparents' home. On May 12, 2014, the court ordered Ki detained from her parents and granted Mother monitored daily visitation and Father monitored visitation three times per week.

After the detention, the maternal grandmother and aunt reported that Mother continued to suffer mental and emotional problems that had not been fully addressed. There were no new allegations of domestic violence, but the

reunification services were terminated for Ky, and a hearing to consider termination of parental rights over both older children was scheduled. Ky is not a subject of this appeal.

4

caseworker concluded Ki was in danger based on: (1) Father's failure to deal with the issues that led to the assertion of jurisdiction over K, as demonstrated by the verbal assaults on the caseworkers and the verbal confrontations with Mother described in the detention report; (2) Mother's lack of forthrightness concerning her continuing relationship with Father; and (3) a concern that Mother and Father would flee with Ki to Alabama.

Between the detention and the June 2014 jurisdictional report, Father did not keep in regular contact with DCFS, and DCFS was unable to arrange visitation. The report stated that Father had "left a few voice messages for CSW Jones at 8 PM, and the messages [were] threatening and argumentative." In addition, Father sent several emails to the caseworkers in April and May. One accused the two caseworkers who discovered him at Mother's home of removing Ki "for no reason," and said Father did not feel comfortable having either of them as his assigned caseworker. In July, a new caseworker attempted to set up a visitation schedule for Father. When she called, Father was hostile and refused to communicate over the telephone, calling the caseworker a liar.

At the September 2014 jurisdictional hearing, the court found true that Mother and Father had a history of engaging in violent altercations based on the factual findings of the earlier petitions, viz., that Father had tied Mother to a chair, struck her with a rope, and slapped her, that Mother threw boiling water at Father and struck K with a belt, and that the couple engaged in incidents of domestic violence in front of K. The court further found that Father had "failed to comply with Court Ordered counseling and . . . continues to be aggressive and have angry outbursts when in [Mother's] and children's presence," and that Mother "minimizes [Father's] threatening and aggressive conduct." Jurisdiction was asserted under section 300, subdivisions (b) and (j).

5

Turning to disposition, the court instructed Father to participate in a 52-week domestic violence program and individual counseling to address anger management and domestic violence.[5] It instructed Mother to participate in individual counseling to address domestic violence and empowerment. It ordered both parents to participate in an Evidence Code section 730 psychiatric evaluation.

## 2. *Events Preceding June 2015 Review Hearing*

In October 2014, Father began a 52-week counseling program focused on addressing anger and domestic violence. He commenced visitation with Ki at DCFS offices in November. Visits took place in the DCFS office near the grandparents, although Father had requested the visitation site be moved to an office closer to him. The DCFS monitor and the caseworker described Father as caring, loving and affectionate. He brought snacks and toys, and the children listened to his direction.

In October 2014, Father asked that his aunt, E.J., be assigned as his monitor. In December, the court ordered DCFS to set up visitation with E. as monitor, and to prepare a report discussing, among other things, liberalization of parental visits. After an investigation, the caseworker found nothing to preclude E. from becoming a monitor.[6] In January and February 2015, the court instructed DCFS to set up the visitation monitored by the paternal aunt and report on the quality of Father's visitation. The caseworker who had been assigned to the case in October went on

---

[5] Father immediately moved, pursuant to section 388, to change the dispositional order on the ground there had been no incidents of domestic violence since he completed the Alabama programs. The court denied the request.

[6] The caseworker reported that visitation could not be liberalized because DCFS had not yet received the report of the Evidence Code section 730 evaluator. In February 2015, the evaluator submitted his reports. He found that Father suffered no mental illness.

medical leave in February, and the matter was assigned to a new caseworker. In March, the caseworker set up the visits, and both parents began visiting the children in the aunt's home. The aunt reported that the visits were appropriate, but that the grandparents often stayed and distracted the children from interacting with their parents. That same month, another new caseworker was assigned, Gerald Udemezue. Father texted Udemezue saying he believed the grandparents were "plant[ing]" allegations in K's head. When questioned about his progress in court-ordered programs, Father said that he had "done everything for many years" and was still being given "a run around."

By May 2015, Father had completed 37 weeks of his 52-week program, which included domestic violence/anger management counseling, individual counseling and parenting classes. His counselor, Roger Davis, reported that Father was remorseful about his past actions of domestic violence. Davis expressed the opinion that Father was not a threat to his children, and should be permitted unmonitored visitation.[7]

In the October 2014 review report, DCFS recommended that Ki remain in her grandparents' home and that reunification services continue to be provided to her parents. At the review hearing -- which took place over the course of several days in June 2015, more than a year after the detention -- DCFS's recommended termination of reunification services.

---

[7]    Davis said Father was working hard to educate himself on how to deal with domestic situations that might arise in the future, including recognizing when he was in an aggression cycle and dealing with his anger "when faced with a negative situation." Davis's report stated that Father was "making every effort" to avoid becoming "controlling, antagonistic, rude, and disrespectful" and that he was "learning how to better manage his anger, stop violence or the threat of violence, [and] develop self-control over his thoughts and actions . . . ."

At the hearing, Udemezue testified that he had concerns about Father's progress notwithstanding his counselor's report because in many of their interactions Father become upset and belligerent, raised his voice, and swore. Father also made disparaging remarks about the caseworker, the department and the judge, asked for the caseworker to be removed, and hung up on the caseworker in the middle of a phone call. In addition, during interviews with both parents present, when Udemezue asked Mother a question, she looked at Father before responding and did not appear to be capable of acting independently. Udemezue testified that he had met with Father three or four times since March 2015, and that Father had refused to answer any questions about his program. Udemezue expressed some concerns about Father's counselor's qualifications, but acknowledged he had neither mentioned those concerns to Father nor spoken to the counselor.

Rashawn Davis, who monitored Father's visits from November 2014 to January 2015, testified that Father interacted with the children appropriately throughout the visits. He played with them, read to them, and occasionally verbally corrected them. He brought snacks and gifts for the children at Christmas.

In closing, counsel for the minors argued that reunification services should be terminated. She contended the evidence established that both parents lacked insight, displayed poor judgment, and continued to pose a risk to all their children. Counsel pointed to evidence that Father blamed the caseworkers and the grandparents rather than himself for his issues, and that Father had "exhibit[ed] anger and inappropriate reactions" rather than good judgment when placed in triggering situations. She further contended that Father demonstrated a "pattern of dishonesty" concerning his living situation and his relationship with Mother. She expressed concern that this dishonesty would cause future domestic violence to be covered up.

8

Counsel for DCFS argued that the parents lacked insight or understanding into their relationship problems. He further contended that Father's interactions with the caseworkers demonstrated that his issues were ongoing and unresolved.

Father's counsel argued that because Father had completed most of the counseling required by the court, he was in compliance with his case plan and Ki should be returned to him. Alternatively, counsel asked the court to make a "no reasonable services" finding, contending that the caseworkers were at fault for failing to communicate their concerns about the program and his compliance to Father.

The court found that although Father was making substantial progress, he still had unresolved issues. The court criticized DCFS for repeatedly replacing the caseworkers and stated that the assigned caseworker would need to "contact and meet with these parents on a much [more] regular basis than what was happening previously." Nonetheless, the court found that DCFS had complied with the case plan by making reasonable efforts to enable the child to return home. The court further found that returning Ki to the physical custody of either of her parents would create a substantial risk of detriment to her safety and physical and emotional well being, but that the parents had made significant progress in resolving the issues that led to her removal, and that there was a substantial probability that she could be returned within six months. The court extended reunification services for Ki. Visitation with Ki remained monitored, with DCFS discretion to liberalize.[8]

---

[8] Although it ordered reunification services terminated with respect to K and Ky, it permitted Father unmonitored visitation with them, once a week.

### 3. *Events Preceding Issuance of the Restraining Order*

In March 2015, shortly after caseworker Udemezue was assigned, Mother and Father called him to ask if they could visit the children together at the grandparents' home. Udemezue expressed concern about a joint visit and asked for additional time to review the case.[9] Father thereafter texted Udemezue, saying he intended to record their conversations. In April, Father called Udemuzue, and after Udemuzue refused him permission to tape the call, began to make disparaging remarks about the caseworker.

On June 17, 2015, Udemuzue applied for a restraining order claiming Father had left a threatening voicemail, saying "'I will deal with you, you will see what I will do. I am going to deal with you and file a defamation law suit against you. You cannot mess with me. Do not ask me what I am talking [sic].'" The court issued a temporary restraining order preventing Father from coming within 100 yards of Udemuzue, his residence or his vehicle.

At the July 1, 2015 hearing on the application, Udemuze testified that Father called him on the day after he testified at the review hearing and said: "I'm going to deal with you. You came to court to lie about me. You are a liar . . . . [¶] I would deal with you. When I'm done dealing with you, I will take you to court." After the call, Udemuze felt threatened and afraid.

Father's counselor, Roger Davis, called by Father, testified that on June 11, he was on a three-way telephonic conversation with Father and Udemuze. Davis said that during the call, he, not Father, threatened to take Udemuze to court because of something Udemuze had said about the counselor earlier.

---

[9] The court did not issue an order permitting the parents to visit together until April 2015.

After hearing the evidence, the court issued a one-year restraining order. The restraining order precluded Father from coming within 100 yards of Udemuze, his residence or his vehicle; he was permitted to communicate with Udemuze by telephone, text or email. Father appealed.

## DISCUSSION

A. *Custody*

"'At [the] 6-, 12-, and 18-month review hearings, the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being.'" (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789, quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 307; see §§ 366.21, subds. (e)(1) & (f)(1), 366.22, subd. (a)(1); *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 ["Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody"].) The agency has the burden of establishing detriment. (*David B. v. Superior Court*, *supra* 123 Cal.App.4th at p. 789; §§ 366.21, subds. (e)(1) & (f)(1), 366.22, subd. (a)(1).) Father contends the court's finding at the June 2015 hearing that returning Ki to his custody posed a risk of detriment was not supported by substantial evidence. We disagree.

In evaluating whether return of the child would create a substantial risk of detriment to his or her physical or emotional well-being, "the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement. [Citations.]" (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.) "This court views the record to determine whether substantial evidence supports

11

the court's finding that [the minor] would be at substantial risk of detriment if returned to [the parent's] custody. [Citation.] In so doing, we consider the evidence favorably to the prevailing party and resolve all conflicts in support of the trial court's order." (*Id*. at pp. 1400-1401.)

Here, Father had anger issues that caused him to domestically abuse his wife and terrorize his child, as well as intimidate and threaten the DCFS caseworkers when they attempted to check on Ki's wellbeing. After years of ignoring the court's orders and DCFS's instructions, Father finally began participating in a domestic violence and anger management counseling program in October 2014, five months after Ki was detained. At the time of the review hearing, he was several months from completing the program. The court acknowledged that Father was making progress, but found he had not fully resolved the issues that led to the assertion of jurisdiction, or reached the point at which Ki would be safe in his care.[10] Substantial evidence supported that determination. The counselor's claim that Father had learned to manage his anger and cease his violent or threatening behavior was belied by Father's interactions with the caseworkers during the proceedings. Udemezue, who became the caseworker after Father had completed nearly half the program, reported that Father continued to display anger and belligerence during their interactions, including raising his voice, swearing, making disparaging comments, and hanging up the phone in mid-conversation. This culminated in the threat issued on June 11, 2015, the day after Udemuzue

---

[10] Respondent contends the court "did not find credible [the counselor's] progress letter indicating how much progress Father had made." Although the court found that Father's actions did not match the counselor's predictions with respect to his ability to deal with difficult situations, it also found that Father had made significant progress in alleviating the conditions that led to the assertion of jurisdiction by participating in the program and stated that it trusted the report with respect to Father's acceptance of responsibility.

testified at the review hearing. Prior caseworkers had attested to Father's hostility, lack of cooperation and refusal to communicate. In view of the reports of caseworkers who had interacted with Father, the court was not bound by the counselor's assessment that Father had addressed his anger issues and posed no threat to Ki. Its finding that Father had made insufficient progress to warrant Ki's return was supported by substantial evidence.

B. *Reasonable Services*

A family reunification plan must be developed as part of any dispositional order removing a child from its home. (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1776.) "[T]he plan must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. [Citation.]" (*Id.* at p. 1777.) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .'" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973, quoting *In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "Visitation is an essential component of any reunification plan," and "must be as frequent as possible." (*In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.)

Father contests the court's finding that he was provided reasonable reunification services. Acknowledging that DCFS "correctly identified [Father's] problems and developed an appropriate reunification plan," he contends it failed to maintain adequate communication with him or provide appropriate visitation with Ki. We agree with the court in *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, that the governing statute "does not authorize an appeal from

13

[an] isolated finding," such as the finding that the agency provided reasonable services, "in the absence of an adverse order resulting from that finding." (*Id*. at p. 1154.) If the agency fails to provide reasonable services, the remedy is to provide additional services. Here, however, the court found that the parents were in substantial compliance and provided additional services.

Moreover, were we to address the merits, we would not overturn the juvenile court's finding. Although the court faulted DCFS for repeatedly replacing the caseworkers and the caseworkers for failing to contact the parents more frequently, the evidence established that Father was in a DCFS-approved program, making substantial progress. Father points to no impediment to his ability to comply with the case plan that can be attributed to caseworker turnover or the irregularity of communication. Moreover, except for a brief period after the detention when he was not in communication with the caseworker, he had regular, positive visitation with Ki and his other children. That the visitation was not always in a place or with a monitor of his choosing did not require the court to find that the reunification services provided were inadequate.

### C. *Monitored Visitation*

Appellant contends the court abused its discretion by ordering that Father's visits with Ki continue to be monitored, pointing out that he was provided weekly unmonitored visitation with his older children. We conclude the court did not abuse its discretion.

"There is no question but that the power to regulate visitation between minors determined to be dependent children [citation] and their parents rests in the judiciary." (*In re Jennifer G*. (1990) 221 Cal.App.3d 752, 756.) Defining the boundaries of the parent's visitation "necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child." (*Id*. at 757.)

14

"In balancing these interests, . . . [t]he court may, of course, impose any . . . conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*Ibid*.)

Support for an order restricting a parent's visitation does not require proof of actual harm to the child by the parent; the standard is substantial risk or danger of harm. (See *In re Marriage of Birdsall* (1988) 197 Cal.App.3d 1024, 1030; *In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1656-1658.) In determining the need for such an order, "the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C*. (2009) 174 Cal.App.4th 900, 917; see also *In re Y.G*. (2009) 175 Cal.App.4th 109, 116 [juvenile court may "consider a broad class of relevant evidence in deciding whether a child is at substantial risk from a parent's failure or inability to adequately protect or supervise the child"].) "[D]ependency law affords the juvenile court great discretion in deciding issues relating to parent-child visitation, which discretion we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason. [Citation.]" (*In re S.H*. (2011) 197 Cal.App.4th 1542, 1557.)

The evidence established that Father had made progress, but had not completely resolved the issues that led to the assertion of jurisdiction. He continued to become angry and to issue threats when interacting with the caseworkers. He continued to assert the claim that his participation in the one-month long Alabama programs constituted full compliance with the court's orders. In addition, he had been deceptive about his California residency and relationship with Mother, and had threatened to take Ki to Alabama to thwart DCFS. Although the court permitted unmonitored visitation with K and Ky, they were older and able to report inappropriate behavior. In view of these factors, we cannot say the court abused its discretion in requiring visitation with Ki to continue to be monitored for another review period.

15

D. *Restraining Order*

An appellate court applies the substantial evidence standard of review to the trial court's factual findings in support of a restraining order (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 822), and the abuse of discretion standard to its decision to issue the order. (*In re N.L.* (2015) 236 Cal.App.4th 1460, 1465-1466.) Challenges to the sufficiency of the evidence are viewed in a light most favorable to the respondent, and we indulge all legitimate and reasonable inferences to uphold the juvenile court's determination. (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210.) "If there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed." (*Id*. at pp. 210-211.)

Father contends the court abused its discretion in issuing the restraining order requested by Udemezue because substantial evidence does not support the facts found true by the court to justify its issuance.[11] First, he contends Udemezue lacked credibility because he stated the threat was left in a voicemail in his declaration in support of the restraining order, but testified at the hearing that the threat was made while he was on the phone with Father. "The trier of fact determines the credibility of witnesses, weighs the evidence, and resolves factual conflicts," and "may believe and accept as true only part of a witness's testimony and disregard the rest." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) "On appeal, we must accept that part of the testimony which supports the judgment." (*Ibid*.; see *In re P.A.* (2006) 144 Cal.App.4th 1339, 1343-1344 [findings upheld

---

[11]    Although the restraining order expired on July 1, 2016, the appeal is not moot. As the court explained in *In re Cassandra B*., the issuance of a restraining order "could have consequences for [the parent] in . . . future court proceedings" because the existence of one restraining order "must be considered by the juvenile court in any proceeding to issue another restraining order against [the parent]." (*In re Cassandra B*., *supra,* 125 Cal.App.4th at pp. 209-210.)

16

despite inconsistencies in witness's statements].)  The court credited Udemezue's testimony, and we do not disturb that finding.

Father further contends that no reasonable person would have viewed the words used as a threat of "physical harm," and that Father clearly meant only that he would initiate litigation against Udemezue.  He further points out that he had disagreements and negative interactions with prior caseworkers without ever having engaged in physical violence.  According to Udemezue, Father stated that he would "deal" with him, and that when he was done "dealing" with him, he would take Udemezue to court.  The court could reasonably interpret this as a threat of physical violence in view of the evidence in the record that Father had been physically violent with Mother in the past, and had threatened and attempted to intimidate multiple prior caseworkers.  We conclude the court's factual findings were supported by substantial evidence. Accordingly, the court did not abuse its discretion in issuing the restraining order.

## DISPOSITION

The court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.

18